# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
        **Plaintiff,**

    v.                                    **Case No. 09-CR-302**

**OSCAR DIAZ**
        **Defendant.**

## SENTENCING MEMORANDUM

Defendant Oscar Diaz pleaded guilty to possessing child pornography, contrary to 18 U.S.C. § 2252A(a)(5)(B), and I set the case for sentencing. In imposing sentence, the district court must first calculate the defendant's advisory guideline range, then consider the factors set forth in 18 U.S.C. § 3553(a) in order to determine an appropriate sentence. United States v. Panice, 598 F.3d 426, 441 (7th Cir. 2010).

## I. GUIDELINE CALCULATION

Defendant's pre-sentence report ("PSR") set a base offense level of 18 under U.S.S.G. § 2G2.2(a)(1), with enhancements of 2 levels because the offense involved depictions of prepubescent minors, § 2G2.2(b)(2); 4 levels because the offense involved material portraying sadistic, masochistic, or violent conduct, § 2G2.2(b)(4); 2 levels for use of a computer, § 2G2.2(b)(6); and 5 levels based on the number of images involved, § 2G2.2(b)(7)(D), for an adjusted level of 31. Following a 3 level reduction for acceptance of responsibility based on defendant's timely guilty plea, § 3E1.1, the PSR set a final level of 28. Defendant had no prior record, so the report set a criminal history category of I, producing an imprisonment range of 78-97 months. The parties agreed with these calculations, which I adopted.

## II. SECTION 3553(a)

**A.     Sentencing Factors**

In imposing the actual sentence, the district court must consider the factors set forth in § 3553(a), see, e.g., United States v. Christiansen, 594 F.3d 571, 576-77 (7th Cir. 2010), which include:

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    the need for the sentence imposed–

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)    the kinds of sentences available;

(4)    the advisory guideline range;

(5)    any pertinent policy statements issued by the Sentencing Commission;

(6)    the need to avoid unwarranted sentence disparities; and

(7)    the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The statute provides that the court shall, on considering these factors, impose a sentence that is "sufficient, but not greater than necessary to comply with the purposes set forth" in sub-section (a)(2): just punishment, deterrence, protection of the public, and rehabilitation of the defendant. 18 U.S.C. § 3553(a). In making this determination, the district

2

court may not presume that the guideline sentence is the correct one. Nelson v. United States, 129 S. Ct. 890, 892 (2009). The court is also free to reject any guideline on policy grounds, see, e.g., United States v. Pape, 601 F.3d 743, 749 (7th Cir. 2010); United States v. Corner, 598 F.3d 411, 414-15 (7th Cir. 2010) (en banc), particularly where the Sentencing Commission did not, in adopting the particular guideline, fulfil its "characteristic institutional role" of basing the range on study, expertise, empirical data, or national experience, see Kimbrough v. United States, 552 U.S. 85, 109 (2007). Ultimately, the district court must make an independent determination as to the appropriate sentence, taking into account the types of sentences available, the relevant § 3553(a) factors, and the arguments of the parties. See Gall v. United States, 552 U.S. 38, 49-50 (2007). The court must then explain the chosen sentence in order to promote the perception of fair sentencing. Id. at 50.

**B.   Analysis**

   **1.   The Offense**

Using Limewire, a peer-to-peer file sharing network, an FBI agent downloaded four image files and one video of suspected child pornography from a user with a certain IP address. A subpoena revealed that the subscriber lived in Milwaukee, and detectives traveled to the residence and encountered defendant. He agreed to a search of the suspect computer, which revealed over 500 images of child pornography and 113 videos. Based on the discovery, agents got a search warrant for defendant's residence, and during the execution defendant admitted downloading child pornography from Limewire since about 2007. He further admitted that he had printed out some of the images and stored them in a box under a crawl space under the porch. Police recovered the box, which contained printed images of child

pornography, as well as binders containing other printed images from the basement.

The National Center for Missing and Exploited Children identified several children depicted in the images, and the court received victim impact statements. Reading from the statements, the prosecutor indicated that the victims felt abused again every time the images were viewed and lived in fear that they would be recognized by those who seemed to enjoy watching their abuse.

### 2. The Defendant

Defendant was thirty years old, with no prior record and an otherwise positive background. Born in Mexico in 1980, he came to the United States with his family in 1984, graduated high school, obtained U.S. citizenship in 1999, and worked in his father's auto glass and trucking companies for many years. He lived with his parents and brother in the same house for about fifteen years. Defendant apprised his family of this offense, and they remained supportive. Family members suggested that isolation and loneliness contributed to defendant's conduct. I received numerous positive letters from friends, family members, and work associates. No one expressed concern for their own children being around defendant.

Shortly after his indictment and release on bond in this case, defendant requested that his conditions be modified to include mental health counseling. He then enrolled in out-patient treatment with Dr. Joan Nuttal, a clinical psychologist, exploring the issues related to his computer use and viewing of pornography. Dr. Nuttal indicated that defendant was committed to treatment, had a genuine desire to get help, was eager to understand his problem better, and did not want to re-offend. She described him as a quiet individual with poor social skills and some intellectual limitations. Like his family, she believed that his involvement in this offense arose out of his extreme loneliness and poor self-esteem. As often seems to happen

4

in these cases, he started looking at images of adults, then gradually began to explore younger children. In addition to complying with mental health treatment, defendant abided by his other conditions of pre-trial release.

### 3. The Guidelines and Purposes of Sentencing

The guidelines recommended that defendant serve 6 ½ to 8 years in prison in this case, a range approaching the statutory maximum of 10 years, despite his lack of any prior record or any indication of sexual contact with a child. This was the result of the application of U.S.S.G. § 2G2.2, "an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results." United States v. Dorvee, 604 F.3d 84, 98 (2d Cir. 2010). Recognizing the flaws in this guideline, judges across the country have declined to impose sentence within the range it recommends. See, e.g., United States v. Tews, No. 09-CR-309, 2010 WL 1608951, at *3 (E.D. Wis. Apr. 20, 2010) (citing United States v. Howard, No. 8:08CR387, 2010 WL 749782 (D. Neb. Mar. 1, 2010); United States v. Manke, No. 09-CR-172, 2010 WL 307937 (E.D. Wis. Jan. 19, 2010); United States v. Raby, No. 2:05-cr-00003, 2009 WL 5173964 (S.D. W. Va. Dec. 30, 2009); United States v. Burns, No. 07 CR 556, 2009 WL 3617448 (N.D. Ill. Oct. 27, 2009); United States v. McElheney, 630 F. Supp. 2d 886 (E.D. Tenn. 2009); United States v. Phinney, 599 F. Supp. 2d 1037 (E.D. Wis. 2009); United States v. Grober, 595 F. Supp. 2d 382 (D.N.J. 2008); United States v. Stern, 590 F. Supp. 2d 945 (N.D. Ohio 2008); United States v. Doktor, No. 6:08-cr-46, 2008 WL 5334121 (M.D. Fla. Dec. 19, 2008); United States v. Johnson, 588 F. Supp. 2d 997 (S.D. Iowa 2008); United States v. Noxon, No. 07-40152, 2008 WL 4758583 (D. Kan. Oct. 28, 2008); United States v. Ontiveros, No. 07-CR-333, 2008 WL 2937539 (E.D. Wis. July 24, 2008) (Griesbach, J.); United States v. Hanson, 561 F. Supp. 2d 1004 (E.D. Wis. 2008); United States v. Shipley,

5

560 F. Supp. 2d 739 (S.D. Iowa 2008); United States v. Baird, 580 F. Supp. 2d 889 (D. Neb. 2008)); but see United States v. Cunningham, 680 F. Supp. 2d 844 (N.D. Ohio 2010) (defending the guideline); United States v. Fiorella, 602 F. Supp. 2d 1057 (N.D. Iowa 2009) (declining to vary from the guideline range), aff'd, 598 F.3d 444 (8th Cir. 2010), cert. denied, 2010 WL 1922722 (U.S. June 14, 2010).

The manner in which this guideline developed into its current form has been explained elsewhere, see Manke, 2010 WL 307937, at *5-6; Phinney, 599 F. Supp. 2d at 1041-43, and I incorporate that historical discussion here. In sum, the guideline is largely the product of congressional directives, some of which the Sentencing Commission actively opposed, rather than Commission study and expertise. The Supreme Court has held that a sentencing judge need not defer to such a guideline. See Kimbrough, 552 U.S. at 109-10.

Further, the guideline requires significant enhancements for conduct present in virtually all cases. In this case, for instance, defendant received enhancements of 2 levels for possession of material involving children under age twelve, an enhancement applicable in 94.8% of sentences under § 2G2.2 in fiscal year 2009; 4 levels for possession of material involving sadistic or violent conduct, applicable in 73.4% of cases in 2009; 2 levels for use of a computer, applicable 97.2% of the time; and for number of images, applicable 96.6% of the time, with 63.1% of offenders receiving the 5 level increase this defendant did. See Dorvee, 604 F.3d at 96; United States Sentencing Commission, Use of Guidelines and Specific Offense Characteristics for Fiscal Year 2009 36-37. As the Second Circuit recently explained, these enhancements produce a sentence approaching the statutory maximum, even for an offender with no prior record, based solely on characteristics that are all but inherent to the crime of conviction, an approach fundamentally inconsistent with § 3553(a). Dorvee, 604 F.3d at 96.

6

Aside from applying in virtually all cases, these enhancements suffer from additional flaws. As the Sentencing Commission noted, the use of a computer enhancement fails to distinguish serious commercial distributors of online pornography from more run-of-the-mill users. See Dorvee, 604 F.3d at 95-96. As the Commission also noted, the enhancement is logically flawed because online pornography generally comes from the same pool of images found in print format. See Hanson, 561 F. Supp. 2d at 1009-10.

The number of images enhancement is also questionable because, as a result of internet swapping, offenders readily obtain the necessary number of images with minimal effort. See id. at 1010. In any event, to the extent that the number of images a defendant possessed may serve as a valid proxy for the harm he caused, nearly doubling his sentence – as occurred in this case – overstates that harm.[1] Sadly, the worldwide market for child pornography is so vast that the relative impact of several hundred additional images is minuscule, yet results in a significant increase in the guideline range. See Raby, 2009 WL 5173964, at *7; see also Hanson, 561 F. Supp. 2d at 1012 (indicating that number and type of images is a relevant factor, but declining to give it great weight).

The 4-level enhancement for depictions of sadistic or violent conduct applies "regardless of whether the defendant specifically intended to possess [or] access with intent to view . . . such materials." U.S.S.G. § 2G2.2 cmt. n.2. Not only is this a rather odd way of measuring personal culpability, it flies in the case of the primary rationale for banning possession of child pornography. See Osborne v. Ohio, 495 U.S. 103, 109-10 (1990) ("It is . . . surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes

---

[1] The 5 level enhancement defendant received increased his guideline range, at the low end, from 46 to 78 months.

7

those who possess and view the product, thereby decreasing demand."). If harsher punishment is warranted to reduce the demand for material that results in greater harm to children, a defendant who does not specifically seek out the worst should not be treated the same as an offender who does. See Hanson, 561 F. Supp. 2d at 1009. In this case, there was no indication that defendant sought out such material, and the PSR described just one qualifying image.

Finally, to the extent that Congress, in increasing the penalties in child pornography cases, was concerned about commercial pornography dealers or those who actually abused children, see Phinney, 599 F. Supp. 2d at 1042, there was no evidence of that here either. Therefore, I found the guidelines unhelpful in this case.

The government cited United States v. Cunningham, in which the court stressed the severity of child pornography offenses and sought to defend U.S.S.G. § 2G2.2 from the criticisms leveled against it. Cunningham involved receipt and distribution offenses, 680 F. Supp. 2d at 845, not just simple possession of child pornography, as this case did, so some of the court's comments were inapplicable here, see id. at 847 (quoting congressional report about the need to increase the penalties for the sale and distribution of obscene materials). However, the court also addressed child pornography cases generally. I must respectfully disagree with the court's observations.

The Cunningham court began by attempting to focus on the harm caused to children, quoting Nelson Mandela: "There can be no keener revelation of a society's soul than the way in which it treats its children." Id. at 847. The court described child pornography as "vile" and "heinous," and noted that in criminal prosecutions the offense is often sterilized, the victims remain nameless, and the only emotions on display are those of the defendants. Id.

No one disputes that child pornography is a serious problem, or that real children are harmed in its production. The voices of those victimized should be heard (and in the present case they were, both in the form of impact statements and the AUSA's powerful presentation in court). But as Judge Goodwin has explained, while those who traffic in or consume child pornography must be punished,

> a spectrum of criminal culpability is involved in this crime. Those who produce and distribute these images are at one end of the spectrum. They deserve the harshest punishment. At the other end of the spectrum are men . . . who view these disgusting images. Rather than physically harming a child, their criminal act is complete by entering a market with a few clicks of a mouse. . . . While these men bear responsibility for the horrors created by child pornography, any system of justice must attempt to emotionally remove itself from natural instincts of revenge and retribution.
>
> These pathetic men make easy targets. There is nothing redeeming or even understandable about this crime. But judges must objectively consider whether the sentences imposed further the goals of punishment. To do so, we must differentiate between those who create child pornography and those who consume it.

United States v. Cruikshank, 667 F. Supp. 2d 697, 701-02 (S.D. W. Va. 2009) (internal citations omitted).

The Cunningham and Fiorella[2] courts suggested that sentencing judges actually view the images rather than relying on written descriptions. 680 F. Supp. 2d at 854; 602 F. Supp. 2d at 1075 n.8. While judges should apprise themselves of all pertinent information in imposing sentence – and should not shrink from the task just because it may be unpleasant – I am concerned that these courts may be suggesting that sentence be imposed based on

---

[2]In Fiorella, although the defendant pleaded guilty to possession, the court found that she participated in the production of child pornography and the exploitation of her own daughter. 602 F. Supp. 2d at 1067-70. Obviously, a severe sentence is warranted when a defendant engages in such conduct. See United States v. Krueger, No. 09-CR-103, 2009 WL 4164122 (E.D. Wis. Nov. 23, 2009). Nothing of the sort occurred in the present case.

9

visceral reactions, rather than objective, rational analysis. It is also worth noting that to the extent the children feel re-victimized every time their images are viewed, having judges personally examine the entire record of their torment may not be helpful.

The Cunningham court also attempted to refute the criticisms of U.S.S.G. § 2G2.2. The court had to concede, at the outset of its discussion, that Congress repeatedly instructed the Commission to modify the guideline, often with little or no input from the Commission. The court also acknowledged that "[c]rimes involving the exploitation of children provide fertile ground for grandstanding politicians," such as Senator Jesse Helms, who called for tougher penalties on "smut peddlers and pedophiles." 680 F. Supp. 2d at 849. However, the court noted that while the Commission made changes to the guideline in 1991 in response to legislation Helms introduced, a 1990 Commission Report recommended two of the same changes included in the congressional act: "increasing the base offense level for § 2G2.2 from 13 to 15, and including a specific offense characteristic at § 2G2.2 for pattern of abuse." Id. at 849.

This provides no support for the guideline as it exists and applies to most possession offenders today. In 1991, U.S.S.G. § 2G2.2 pertained to trafficking, not possession of child pornography, see United States Sentencing Commission, The History of the Child Pornography Guidelines 24-25 (Oct. 2009), and the increase for a pattern of activity involving the sexual abuse of children has not, to my knowledge, been criticized, see Manke, 2010 WL 307937, at *5 (noting that the Commission studied this issue). Of course, offenders who systematically abuse children should be harshly punished, but most child pornography defendants do not engage in such conduct: this enhancement applied in just 9.2% of cases in FY 2009, United States Sentencing Commission, Use of Guidelines and Specific Offense Characteristics for

10

Fiscal Year 2009 37, and it did not apply in this case.

The Cunningham court then noted that despite continued congressional interference, including a direct amendment to the guideline adding the number of images table and the enhancement for possessing sadistic or masochistic images, the Commission did engage in some study, including a prison impact analysis, an examination of state sentencing practices for child pornography offenses, and a project examining offenders sentenced under §§ 2G2.2 and 2G2.4, including departure rates in child pornography cases. 680 F. Supp. 2d at 849-50. None of this responds to the criticisms of the specific guideline enhancements, discussed above, implemented at the direction of Congress. The court also noted that the Commission had to implement the changes, including by creating certain definitions. Id. at 850. But again, the court fails to explain how this meant the Commission fulfilled its designated role of developing guidelines based on study, data, or national experience.

The Cunningham court next noted that the Commission had to determine an appropriate base offense level after Congress adopted a five-year statutory mandatory minimum for certain offenses. Id. at 850-51. It is true that the Commission studied how best to do this, as I discussed in Phinney, 599 F. Supp. 2d at 1042-43, and Manke, 2010 WL 307937, at *5-6, but what the Cunningham court fails to acknowledge is that Congress adopted the mandatory minimums with "no advanced notice to or consultation with the Commission," Phinney, 599 F. Supp. 2d at 1042.

> As the Commission discussed in [its] October 2009 Report, it elected to deal with Congress's adoption of mandatory minimums and increased statutory maxima by setting the base level below the mandatory minimum and relying on specific offense characteristics applicable in most cases to reach the statutory mandatory minimum. This may have been a sensible way of dealing with the issue, but it cannot be considered the product of Commission research and study; rather, it was a method of dealing with changes adopted by Congress.

11

Manke, 2010 WL 307937, at *6 n.2.[3]  The Cunningham court never explains why the Commission's actions in implementing changes required by Congress should result in greater respect for the guideline.

> The Cunningham court concluded:
>
> Having reviewed the actions taken by the Commission, the Court finds that giving deference to the Guidelines is appropriate. We are often told that when life gives you lemons, make lemonade. In this instance, the Commission was given grandstanding politicians, but still crafted proper Guidelines. Rather than cede its responsibility, the Commission instead appears to have gone above and beyond to justify its amendments. Far from failing to rely on empirical data and its own expertise, the Commission has conducted formal studies whenever possible and has conducted extensive analyses to fulfill its statutory obligations. Have politicians unduly hampered the Commission's ability to perform its duties? There can be no question that they have interfered. However, at the same time, Congress' actions could be viewed as a necessary response to a crime that was spiraling out of control. As internet access grew across this country, so did the online community of pedophiles that supports the market for child pornography. Rather than remain silent, Congress acted. In turn, the Commission used empirical data and its own expertise to craft the appropriate Guideline amendments. This Court, therefore, declines to join those district judges that have found otherwise.

680 F. Supp. 2d at 851. I agree that the Commission probably did the best it could under difficult circumstances, but to say that the final product is the result of Commission data, study, and expertise simply ignores the facts.

The Cunningham court then tried to respond to the criticism that U.S.S.G. § 2G2.2 requires the imposition of enhancements for conduct present in most cases. The court noted that the Commission realized this when it modified the guideline in response to Congress's passage of mandatory minimums. 680 F. Supp. 2d at 851-52; see also Manke, 2010 WL 307937, at *6 n.2. The court's point is factually correct, but legally irrelevant. As the Second

---

[3]There is no mandatory minimum in simple possession cases, so this was not really a factor in the present case.

12

Circuit recently noted, significantly enhancing a sentence based on characteristics that are inherent to the crime of conviction is fundamentally inconsistent with § 3553(a). Dorvee, 604 F.3d at 96.

The Cunningham court then took issue with the argument that these enhancements often produce a sentence near the statutory maximum, even for an "average offender." Citing the Commission's 2008 Sourcebook of Federal Sentencing Statistics, the court noted that the mean sentence for child pornography offenses was roughly 120 months, well below the statutory maximum of twenty years (for receipt offenses), with relatively few defendants receiving downward variances or departures. This, the court said, showed that most offenders were not receiving sentences near the maximum. 680 F. Supp. 2d at 852. But it appears that the mean sentence to which the court referred included all child pornography offenses – the 5-20 year receipt/distribution cases and the 0-10 possession cases – skewing the figure. I am unaware of data breaking the two classes of cases out.[4]

In any event, actual cases amply illustrate this flaw. In the present case, defendant's range was 78-97 months, in criminal history category I, near the maximum of 10 years; the same for the defendant in Manke, 2010 WL 307937, at *1. In Tews, 2010 WL 1608951, the defendant, also in criminal history category I, faced a range of 63-78 months. The flaw also regularly appears in receipt cases. See Hanson, 561 F. Supp. 2d at 1010-11 (adopting a guideline range of 210-262 for a category I offender, exceeding the statutory maximum of 20 years).

---

[4]The Commission's original approach split possession cases, which were covered by U.S.S.G. § 2G4.4, and trafficking cases, which were covered by U.S.S.G. § 2G2.2. The two guidelines were consolidated in 2004. United States Sentencing Commission, The History of the Child Pornography Guidelines 48 (Oct. 2009).

13

The Cunningham court next noted that the "average offender" must, in order to approach the maximum, engage in aggravating conduct, i.e. have images of a prepubescent minor (+2 levels), distribute the images for value (+5 levels), possess images that are sadistic or masochistic (+4 levels), use a computer (+2 levels), and either engage in a pattern of abuse (+5 levels) or possess more than 600 images (+5 levels). 680 F. Supp. 2d at 852. The conduct required for these enhancements is objectionable but, as noted above, aside from the pattern of abuse enhancement, is present in most cases.[5] There can be no dispute that a defendant, even in criminal history category I, will based on these enhancements approach or exceed the maximum.

Finally, the Cunningham court argued that the fact that certain enhancements apply on a frequent basis does not serve as a basis for negating the guidelines. Id. at 852-53. But where, as here, the imposition of those enhancements results in sentences approaching the maximum in criminal history category I, the approach developed by the Commission breaks down. Specifically, the Commission developed the criminal history axis of the Grid based on its conclusion that a defendant's past record of criminal conduct was directly relevant to the four purposes of sentencing: a defendant with a record is more culpable than a first offender and thus deserving of greater punishment; deterrence requires that a message be sent that repeat criminal behavior will aggravate the need for punishment with each recurrence; to protect the public, the likelihood of recidivism must be considered; and repeated criminal behavior is an indicator of a limited likelihood of successful rehabilitation. See U.S.S.G. ch. 4 introductory commentary. If even a first offender approaches the maximum based on the

---

[5]The distribution for value enhancement was not at issue in this case. See Hanson, 561 F. Supp. 2d at 1009 for a discussion of the problems with this enhancement.

14

offense level alone, chapter four becomes irrelevant, and a first-time offender is treated similarly to a recidivist. That is not what the Commission (or the Sentencing Reform Act) intended.

Before Congress began orchestrating changes to the child pornography guideline, the Commission studied the issue and developed a guideline whereby possession offenders received a base offense level of 10, with an enhancement of 2 levels based on the age of the minors depicted. With a 2 level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1, in criminal history category of I that approach produced a range of 6-12 months. See Phinney, 599 F. Supp. 2d at 1043.[6] Under the circumstances of this case, I found a sentence along the lines originally proposed sufficient but not greater than necessary.

Of course, possession of child pornography is a serious offense, one society and Congress have properly condemned, and I found a period of confinement in prison necessary to provide just punishment in this case. The victim impact letters, which I reviewed and some of which the government read at sentencing, confirmed that this was not a victimless crime.[7] Defendant amassed a sizeable collection, over a period of years. However, he did cooperate with the police when first approached and confessed when they returned with the search warrant. Further, the record contained no evidence that defendant produced any images, shared them with any child, or profited from them in any way. Therefore, a prison term within the Commission's original range sufficed to provide just punishment.

---

[6]It is true that the Commission, at the time it developed U.S.S.G. § 2G2.4, was considering a pattern of abuse enhancement to target offenders who engaged in hands-on offenses. As discussed above, I have no quarrel with such an enhancement.

[7]Defendant stated during his allocution that reading the victim statements had a significant impact on him.

15

A prison sentence within the original range, followed by a lengthy period of supervision with strict conditions, also sufficed to deter and protect the public. Defendant had no prior record, and there was no indication that he had or likely would commit a contact offense with a child. Finally, he had been involved in treatment, with the provider indicating that he was invested and motivated, and had strong family support and an otherwise stable background.

The government argued that it was unclear whether defendant posed a danger, indicating that police found a pair of girl's underwear, which had belonged to a relative, when they searched defendant's house. The government also noted Dr. Nuttal's statement that she was "unsure" if defendant would be classified as a pedophile (PSR ¶ 57), and that defendant declined to fill out a sexual history questionnaire for the probation office. Defense counsel responded that she advised defendant not to fill out the questionnaire, which in any event is no substitute for expert opinion. Dr. Nuttal, a clinical psychologist, may not have yet labeled defendant, but she did provide information as to his investment in treatment and prospects for success. While the discovery of the underwear was somewhat troubling, the government conceded that there was no evidence that defendant had committed a hands-on offense, and I found that this discovery did not alter my basic analysis. Finally, prison is not the only way to deter and protect the public; supervision in the community with strict conditions can also serve those purposes.

Defendant requested a sentence of 1 day, followed by 10 years' supervised release, but I found that insufficient. Some meaningful period of confinement was needed to recognize the seriousness of the offense, particularly given the size of defendant's collection and the length of time over which he engaged in this conduct, and to deter others, given the severity of the child pornography problem. I acknowledged that this sentence would result in an interruption

16

of defendant's treatment, as well as in his work and family ties, but I found it necessary to satisfy the purposes of sentencing in this case. The same was true of defendant's argument regarding the greater costs of incarceration.

Under all the circumstances, I found a sentence of 6 months, followed 12 years of supervised release, sufficient but not greater than necessary to satisfy the purposes of sentencing. This sentence varied considerably from the guideline range, but as explained above, the (current) guidelines provided little meaningful guidance in this case. The sentence was based on my evaluation of the § 3553(a) factors and the particular facts of the case; it thus created no unwarranted disparity.

### III. CONCLUSION

Therefore, I committed defendant to the custody of the Bureau of Prisons for 6 months, followed by 12 years of supervised release. The guidelines in child pornography cases suggest lifetime supervision, see U.S.S.G. § 5D1.2(b), but given defendant's record and progress in treatment, I found this term sufficient to ensure monitoring. As conditions of supervision, I imposed restrictions on defendant's computer access and usage; required him to participate in a mental health treatment program; forbid him from possessing sexually explicit material; required him to register with state and local authorities; required him to provide access to all financial information requested by the supervising probation officer; and required him to perform community service work in lieu of a fine. Other terms and conditions of the sentence appear in the judgment.

Dated at Milwaukee, Wisconsin, this ___ day of June, 2010.

_____
LYNN ADELMAN
District Judge